UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAMES J. TISDALE, | |
| Plaintiff, | CIVIL ACTION NO. 1:21-cv-01849 |
| v. | (SAPORITO, J.) |
| WELLPATH MEDICAL, *et al.*, | |
| Defendants. | |

## MEMORANDUM

Defendants Wellpath Medical ("Wellpath") and Dr. Haseebuddin Ahmed move for summary judgment (Doc. 58) on plaintiff James J. Tisdale's amended complaint alleging that he received constitutionally inadequate medical care for his walking and balance problems at the Lackawanna County Prison. Because the record indicates that Tisdale received ample medical attention, that any medical error fell short of deliberate indifference, and that no error was attributable to a Wellpath custom or policy, the Court grants summary judgment to the defendants.

I. LEGAL STANDARDS

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251-52.

In evaluating a motion for summary judgment, the Court must first determine if the moving party has made *a prima facie* showing that it is entitled to summary judgment. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S.

at 331. Only once that prima facie showing has been made does the burden shift to the nonmoving party to demonstrate the existence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Both parties may cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers or other materials." Fed. R. Civ. P. 56(c)(1)(A).

## II.   MATERIAL FACTS

In this case, the summary judgment record indicates as follows[1]: On May 17, 2021, Tisdale arrived at the Lackawanna County Prison as a pretrial detainee. At an intake screening, a nurse noted that he had a seizure disorder but was not taking the prescribed medication, and that he used a cane and had an unsteady gait, among other medical issues.

---

[1] Tisdale did not respond directly to defendants' statement of material facts, but he filed a response brief along with further evidence. The Court has also considered evidence that Tisdale submitted elsewhere in the record, *see* Fed. R. Civ. P. 56(c)(3), and cites directly to any such evidence not referenced in the parties' briefing. Where Tisdale has failed to present competent evidence to demonstrate a genuine dispute of material fact, defendants' fact statements are deemed admitted. *See* Fed. R. Civ. P. 56(e)(2); M.D. Pa. L.R. 56.1.

The nurse instructed Tisdale on how to obtain medical care and how to use the prison grievance process.

Over the next two weeks, Tisdale made at least two requests for "sick calls" regarding his walking issues. On June 2, 2021, he was seen by Dr. Ahmed, and complained of an unstable gait and tingling and numbness in his trunk and legs. On examination, Dr. Ahmed noted that Tisdale's gait was "wobbly and slow," and that he required a cane but was able to take a few steps unassisted. Dr. Ahmed determined that Tisdale's unstable gait was "secondary to cerebellar degeneration/Falls or Alcohol usage/withdrawal effect of Dilantin." He "narrated" to Tisdale that his walking issues and numbness were caused by a vitamin deficiency, nerve impingement caused by disc degeneration, and withdrawal symptoms. He prescribed nortriptyline, vitamins B12 and D3 supplements, Ensure, and counseled about medication compliance. (Doc. 59-1 at 22-25).

This was the first of dozens of appointments over roughly two years during which Tisdale sought treatment for his seizure disorder, walking and balance problems, and other issues. The prison medical staff treated his walking and balance issues as a chronic condition and suggested increasing his protein intake, exercising to strengthen his legs, and "non-

pharmacological" pain management. Tisdale acknowledged that doctors had told him his tingling and numbness issues were related to degenerative disc disease, which predated his arrival at the prison. *See* (Doc. 59-1 at 30-31, 33). However, Tisdale generally disagreed with the course of treatment and wanted to be referred for additional, unspecified testing. On October 3, 2021, he filed a grievance stating that he had been evaluated for his walking issues but "no one has an actual answer about why my walking is getting bad . . . I just want to actually [find what is wrong] with my walking. P[er]form test to find actual problem."[2]

On February 18, 2022, Tisdale hit his head after apparently suffering a seizure, and was taken to an emergency room. A CT scan at the hospital showed "generalized cerebral volume loss" compared to a scan from 2016, but no evidence of acute fracture of the spine or cranium, and Tisdale was released on the same day. (Doc. 77-1 at 2-4). On February 23, Tisdale had a follow-up appointment with a nurse practitioner and

---

[2] The record also includes a "Health Services Request Form," dated January 14, 2022, stating: "After falling on 12-19-21 and hitting my head twice I noticed my walking & talking getting worse." (Doc. 42-1 at 10). The form is unsigned, and Tisdale does not assert that it was ever submitted. On February 3, 2022, Tisdale apparently submitted a grievance about this incident, which was denied because it was submitted more than 15 days after the incident. *See* (Doc. 38-1 at 15-16).

Dr. Ahmed. Although both providers noted his slow gait, the record does not indicate that Tisdale complained about his walking issues or sought treatment for his spine or legs. Dr. Ahmed recorded "no complaints during this visit," and planned to "follow up with the same treatment," continue observation for any seizure attacks, and ensure Tisdale was placed in a lower bunk bed in a lower tier of the prison. (Doc. 59-1 at 214-217). Nonetheless, on February 25, Tisdale submitted a grievance stating that he had "pain in my spine . . . from mishandling me medically" after the seizure incident. *See* (Doc. 37-1 at 14-17). On June 6 and July 22, a nurse practitioner followed up with the scheduling department to try to arrange Tisdale's neurology consultation, but the record does not indicate the reason for the delays. (Doc. 59-1 at 243, 245).

Between September 12 and September 22, 2022, Tisdale submitted three medical requests renewing his complaints about the prison's treatment of his walking issue. He was seen at a sick call on September 26, and complained that "since coming to this jail, my balance is off and I have to use a cane and a shower chair, I want to have a diagnosis." He was re-referred to a neurologist for "evaluation of ongoing gait dysfunction." Between October 27 and November 2, he submitted another

- 6 -

three sick call requests. On November 7, he was seen by a nurse at a sick call, reporting "episodes of weakness" in his legs that last 24 hours. Noting the "transient and unwitnessed nature" of the symptoms, the nurse wrote that he would be monitored on an ongoing basis, but did not order any further testing or treatment. (Doc. 59-1 at 204-205).

Between December 29, 2022, and January 3, 2023, Tisdale made another five sick call requests pertaining to his walking. He complained: "I get a presumption and no treatment . . . My problem is I have never received any treatment for my walking concern . . . How did you come to your conclusion about my walking? With no tests?" On January 4, Tisdale was seen at a sick call. The nurse practitioner noted that Tisdale's appointment with the neurologist was scheduled for February. She noted that he had not been compliant with his seizure medications, and that she had witnessed him "in this facility walking without a cane, steady gait at a brisk pace." She advised further strength training for his mobility and balance, and continued monitoring. (Doc. 59-1 at 202-03). Between January 8 and January 15, Tisdale made another three sick requests, essentially complaining that the nurse practitioner(s) had diagnosed him without consulting a doctor.

On February 15, 2023, Tisdale had an outpatient consultation with neurologist Kenny Alan Schwartz, which was devoted largely to his seizure disorder and his complaints of headaches. Regarding his back and extremities, Dr. Schwartz assessed "suspected cervical myelopathy with distal spread of the left brachioradialis and left biceps reflex and mild leg weakness brisk knee reflexes more in the left than right, bilateral upgoing toes and sensory loss with decreased sensation to noxious stimulus in the right hand and impaired noxious stimulus, vibration and position in the lower extremities." He noted degenerative changes in the spine, and that Tisdale was "known to have peripheral neuropathy for [a] couple of years." Dr. Schwartz recommended an X-ray, with an MRI potentially to follow, along with blood labs. (Doc. 59-2 at 245-47). Although Tisdale continued to make sick call requests regarding his seizure medications into May 2023 (the last month of available medical records), and he had at least five more appointments with the medical staff during that period, none of these requests or appointments were targeted to his walking or balance issues.

Tisdale filed his initial complaint in this Court on November 1, 2021. On August 19, 2022, the Court dismissed his claims in part, and

permitted him to proceed on a "Fourteenth Amendment claim, brought under 42 U.S.C. § 1983, concerning inadequate medical care related to his issues with balance and walking." (Doc. 46). Tisdale filed an amended complaint consistent with that order on October 10, 2022, naming Wellpath and Dr. Ahmed as defendants. (Doc. 52). Defendants now move for summary judgment. (Doc. 58).

## III. DISCUSSION

Tisdale's Fourteenth Amendment claims arise under 42 U.S.C. § 1983. The statute provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. To establish a Section 1983 claim, a plaintiff must establish that the defendants, acting under color of state law, deprived the plaintiff of a right secured by the United States Constitution. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995).

A pretrial detainee can sustain a claim under the Fourteenth

Amendment by showing (1) "a serious medical need" and (2) "acts or omissions by [individuals] that indicate a deliberate indifference to that need." *Thomas v. City of Harrisburg*, 88 F.4th 275, 281 (3d Cir. 2023) (citations omitted). Deliberate indifference "requires both that an individual be aware of facts from which the inference could be drawn of a substantial risk and that the individual actually draws that inference." *Id*. To establish liability against Wellpath, a private corporation, Tisdale must show that a Wellpath "custom or policy" caused the alleged constitutional violation. *See Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 583-84 (3d Cir. 2003).

In this case, the undisputed record indicates that Wellpath personnel consistently responded to Tisdale's requests regarding his walking and balance issues, and repeatedly evaluated and treated him in response to those requests. Tisdale argues that the defendants are liable because they incorrectly diagnosed his condition and failed to order additional testing. However, these alleged errors, to the extent reflected in the record, do not amount to Fourteenth Amendment violations.

Turning first to Dr. Ahmed, the record of the limited interactions he had with Tisdale does not support an inference of deliberate indifference.

Initially, Dr. Ahmed assessed that Tisdale's walking issues were caused by vitamin deficiencies, disc degeneration and withdrawal symptoms. Even assuming those diagnoses were incorrect, or even negligent, they do not show that Dr. Ahmed intentionally disregarded a risk of serious harm to Tisdale. *See Weigher v. Prison Health Servs.*, 402 Fed. App'x 668, 670 (3d Cir. 2010) (per curiam) ("[A] claim of misdiagnosis would sound in negligence as a malpractice suit, and does not constitute deliberate indifference."); *King v. Cnty. of Gloucester*, 302 F. App'x 92, 97 (3d Cir. 2008) ("Deliberate indifference requires more than inadequate medical attention or incomplete medical treatment."). Tisdale argues that Dr. Schwartz ordering an X-ray in February 2023 shows that Dr. Ahmed should have ordered more testing sooner, but that amounts to "at most, a disagreement with the course of treatment . . . provided by the prison medical staff. The failure to perform x-rays or order additional diagnostic tests does not rise to the level of" deliberate indifference. *Johnson v. Cash*, 557 F. App'x 102, 104 (3d Cir. 2013); *see also Folk v. United States*, No. 3:22-CV-599, 2024 WL 233227, at *9 (M.D. Pa. Jan. 22, 2024) ("The mere fact that an outside medical specialist recommended a certain treatment, and prison doctors opted to attempt another treatment first, does not

amount to deliberate indifference.") (record citation omitted).

As for Wellpath, the record does not support an inference that any errors in Tisdale's treatment were the result of a custom or policy.[3] Tisdale argues that numerous providers failed to arrange additional testing, but as noted, this does not amount to deliberate indifference, and nothing in the record indicates that these decisions were the result of a corporate policy, as opposed to the medical judgments of the individual providers. *See, e.g.*, *Arnold v. Prison Health Servs.*, No. 1:14-CV-345, 2016 WL 930724, at *7 (M.D. Pa. Mar. 11, 2016). Tisdale cites to a case in which Wellpath was found liable in the Northern District of California for providing inadequate medical care, arguing that this "seem[s] to show a pattern" of Wellpath's "normal behavior." But the record does not show how any customs or policies referenced in that case were applied at the Lackawanna County Prison, or if they were, that those specific policies directly caused a violation of his constitutional rights.

---

[3] It is unclear why Tisdale did not receive a consultation with a neurologist until February 2023, given that he was initially referred in February 2022. The record could support an inference that administrative error or oversight by Wellpath employees contributed to the delay. However, no evidence indicates that the delay was intentional or that it could be attributed to a Wellpath custom or policy.

## IV. CONCLUSION

Because Tisdale has not established a genuine issue of material fact as to the viability of his Fourteenth Amendment claims, the Court grants summary judgment to the defendants. An appropriate order follows.

Dated: June 12, 2025     *s/Joseph F. Saporito, Jr.*
                                                JOSEPH F. SAPORITO, JR.
                                                United States District Judge